**GOVERNMENT OF the VIRGIN ISLANDS**

v.

**Keith COMMISSIONG, Defendant.**

**Crim. A. No. 88–79.**

United States District Court,
D. Virgin Islands,
D. St. Thomas and St. John.

Nov. 1, 1988.

---

Terry M. Halpern, U.S. Atty. by Azekah E. Jennings, Asst. U.S. Atty., Charlotte Amalie, St. Thomas, V.I., for Dist. of Virgin Islands.

Grunert, Stout, Moore & Bruch by Susan M. Bruch, Charlotte Amalie, St. Thomas, V.I., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (ON MOTION FOR SUPPRESSION)

BROTMAN, District Judge.*

The Government of the Virgin Islands has charged defendant with first degree murder and possessing a firearm while committing a violent crime in violation of V.I.Code Ann. tit. 14, §§ 922(a)(1) and 2253(a). Presently before the court is defendant's motion to suppress (1) statements and physical evidence obtained from the defendant in the course of the Virgin Islands Police Department's May 4, 1988, interrogation of him and (2) Donna Lambert's line-up identification of the defendant on May 27, 1988. On September 27, 28, and October 5, 1988, the court held an evidentiary hearing and heard the testimony of Raymond Hyndman, Jose Garcia, Reynold Fraser, Jacqueline George, Granville Christopher, and Oswine Abraham, all of whom are members of the Virgin Islands Police Department; Donna Lambert, a witness at the scene of the alleged murder; John Stout, defendant's attorney; and Keith Commissiong, the defendant. Based upon the following findings of fact and conclusions of law, the court will deny defendant's motion.

## I. FINDINGS OF FACT

The events relevant to defendant's suppression motion occurred in the afternoon and early evening of May 4, 1988, while several members of the Virgin Islands Police Department ("the Department") interrogated Keith Commissiong ("the defendant" or "Commissiong") and on the morn-

---

* The Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey, sitting by designation.

ing of May 27, 1988, while the Department held a line-up during which Donna Lambert identified Commissiong. The court makes the following specific findings of fact:

### A. *The Alleged Murder*

1. While Donna Lambert was leaving her home in the Mandahl area of St. Thomas at about 6:30 p.m. on the evening on May 3, 1988, she heard two gunshots. As she drove toward the area from which the sounds emanated, she passed a white station wagon and a black car travelling in the opposite direction.

2. Shortly thereafter she discovered Nancy Linell's body on the roadside. She decided to return to her home to telephone authorities, and as she was leaving the scene she saw the black car return.

3. She observed the car's driver stop, exit his vehicle, walk toward the body, and heard him say, "Can you believe this happened?" Ms. Lambert asked the driver to remain on the scene while she summoned the police; however, the driver left.

4. When the police arrived, Ms. Lambert explained everything she had seen. She described the black car's driver in detail and she assisted a police artist in creating a composite drawing of the man. In addition, she described the car and gave the police her recollection of its license plate number.

5. The Department publicized Ms. Lambert's description. The composite drawing, the license plate number, and a description of the car appeared in a newspaper article the following morning.

### B. *The Interrogation*

#### 1. Commissiong's Meeting with Attorney Stout

6. At about 10:30 a.m. on the morning of May 4, 1988, Commissiong went to the Government Hill law offices of John Stout, a former Assistant U.S. Attorney and an experienced St. Thomas trial lawyer.

7. Commissiong told Stout that he and his car fit the morning newspaper's description of the driver and car observed near where Nancy Linell's body was found.

8. He explained that he was at the scene but left because he was high on crack and was therefore fearful of an encounter with police.

9. He met with Stout from approximately 10:50 a.m. until 12:30 p.m., during which time Stout telephoned the Department's Investigation Bureau. He told the officer receiving his call that there was someone in his office who thought he was the person the police were seeking to question about the homicide.

10. At approximately 12:30 p.m. two Investigation Bureau detectives, Capt. Hyndman and Sgt. Garcia, arrived at Stout's law offices and met with Stout and the defendant in the library.

11. Stout told the two detectives what Commissiong had related to him and then agreed that Commissiong should accompany them to the Public Safety Building for questioning. The detectives implicitly agreed to limit their questioning to the events surrounding the homicide and not to discuss Commissiong's drug use.

12. At that time Commissiong was coherent and fully cognizant of what was going on despite the fact that he had used crack the previous afternoon. Had Commissiong's condition been otherwise, it is doubtful that Stout, an experienced attorney and a former prosecutor, would have permitted him to go alone with the detectives.

#### 2. Sgt. Garcia's Presence in Commissiong's Car

13. The detectives left Stout's law offices with the defendant at approximately 1:15 p.m. or 1:30 p.m.

14. Stout's offices are several blocks from the Public Safety Building.

15. As Capt. Hyndman and Sgt. Garcia were accompanying Commissiong back to the Department, one of them asked him where his car was parked. He responded that it was parked south of the Professional Building in the parking lot next to Fort Christian.

16. When asked whether he would bring the vehicle to the police station, he said that he would.

17. As the three approached the vehicle, a man known by Sgt. Garcia to wash cars in the lot approached Commissiong and Commissiong paid him ten dollars.

18. Capt. Hyndman asked Sgt. Garcia to accompany Commissiong to the Public Safety Building to enable Commissiong to park the car in the area beneath part of the building reserved for Department vehicles and also to enable him to enter the Investigation Bureau offices in a restricted-access area of the building.

19. As Capt. Hyndman then walked to the station, Sgt. Garcia opened the unlocked passenger-side door of Commissiong's vehicle and entered while Commissiong entered on the opposite side.

20. Sgt. Garcia's presence in the defendant's car was with the defendant's implicit permission. Commissiong was cooperating with the police and he agreed to move his car to the police parking lot. At no point did Commissiong object to Garcia's presence in his car.

21. Once Garcia was in the car with Commissiong's consent for the legitimate purpose of accompanying him to the police station, he inadvertently noticed hair fibers in the air conditioning vent on the passenger side, and then he noticed what appeared to be three or four spots of dry blood between the front bucket seats.

22. Garcia removed nothing from the vehicle and gave the defendant no indication that he had noticed anything unusual.

23. Upon arriving at the police station shortly after leaving Stout's law offices Commissiong parked the car where Garcia instructed him to and locked the vehicle, keeping the keys. Garcia then accompanied Commissiong to the Investigation Bureau offices.

3. Commissiong's Waiver of Rights

24. Sgt. Garcia brought Commissiong to an interior office at the Bureau where Detective Fraser, a Department investigator assigned to the case because of his long-standing rapport with Commissiong and his family, met with the defendant.

25. At 1:45 p.m., Detective Fraser read aloud from a document enumerating Commissiong's legal rights in the presence of Commissiong and another investigator, Detective Christopher. Commissiong simultaneously read the recitation of his rights to himself and subsequently signed the document, acknowledging that he understood his rights.

26. Two minutes later, at 1:47 p.m., Detective Fraser read aloud a separate section of the same document containing a voluntary waiver of Commissiong's legal rights, and Commissiong understood it and signed it.

27. Commissiong knowingly and intelligently waived his right to remain silent and his right to have an attorney present during questioning. He understood his rights and he understood the ramifications of waiving them. The court reaches this finding by considering several factors.

(a) Commissiong is an intelligent, college-educated individual who previously held an important position with the Virgin Islands government as Recorder of Deeds.

(b) Commissiong was alert and responsive when he waived his rights. As noted previously, if he had been otherwise it is doubtful that his attorney, who had met with him at some length on the morning of the interrogation, would have permitted him to go alone to police headquarters.

(c) Commissiong was quite willing to cooperate with the police so he could tell them his story about why he was in the Mandahl area the previous evening and why he did not wait for the police.

(d) Commissiong went to the police only after voluntarily appearing at his attorney's office and discussing his situation with his attorney.

28. Upon being advised of his legal rights, Commissiong asked the investigators whether he was under arrest, and, if not, why they read him his rights.

29. The investigators told him that he was not under arrest and that he was ad-

vised of his rights as a precaution in accordance with usual department custom because a car matching the description of his vehicle had been observed at a homicide scene the evening before. Commissiong indicated that he understood.

30. Commissiong then began to give a written statement of his version of the events that occurred in the Mandahl area the night before.

#### 4. Commissiong's Consent to Search his Car

31. Shortly after Commissiong began to give his statement, Detective Christopher interrupted to ask him whether he would consent to a search of his car.

32. Christopher decided to ask the defendant for permission to examine the interior of his vehicle based upon Christopher's conversation with Sgt. Garcia about what Garcia had fortuitously observed while in Commissiong's car.

33. Commissiong agreed to the search, and Christopher read aloud a consent form and Commissiong understood it and signed it.

34. On the same basis that the court found that Commissiong's waiver of his *Miranda* rights was knowing and intelligent, it finds that his consent here was voluntary.

35. The defendant then gave Christopher the keys to his car, and Christopher brought the keys to the Department's forensic unit so its members could conduct the search.

36. The search resulted in the seizure of samples of dry blood found between the car's bucket seats, strands of hair found in the car's air conditioning vents, and a speed loader containing six live rounds of ammunition.

37. Commissiong and his vehicle had been observed at the scene where a homicide victim had been discovered the evening before, and Commissiong came to the police station to try to convince the Department that he was only an innocent passerby. It is inconceivable that the police would not have sought Commissiong's permission to examine the interior of his car or have sought a search warrant to do so. Sgt. Garcia's discovery was the fortuitous catalyst of the search, but it would have occurred anyway.

#### 5. Recovery of Commissiong's Gun

38. During the course of Commissiong's statement Detective Fraser asked him whether he owned a firearm, and the defendant stated that he did and that it was licensed.

39. Fraser asked whether he would mind if the police examined it, and Commissiong said he would not mind and that he would gladly take them to retrieve it from his home.

40. Detectives Fraser and Christopher drove with Commissiong to his Hospital Ground area home in an unmarked police vehicle.

41. Upon arriving at his home, the three encountered Commissiong's aunt, Ms. Thyra Hodge Smith. She asked Fraser what he was doing there and whether the defendant was under arrest, and Fraser told her that he was not.

42. Commissiong then took Detective Christopher to his bedroom where the defendant reached into the closet and retrieved a gun bag from the top shelf. Commissiong gave the bag to Christopher, who opened it and saw a .357 Magnum in two pieces.

43. Christopher gave the weapon to Detective Fraser and the three men returned to the Investigation Bureau, arriving at approximately 3 p.m.

44. Upon his return to headquarters Detective Fraser brought the gun to the forensic unit, and officers there examined the weapon.

45. Meanwhile, Commissiong and Christopher returned to the Investigation Bureau offices.

46. During the course of most of the interrogation Commissiong was in an interior office in police headquarters with Detectives Fraser and Christopher.

47. On a number of occasions Capt. Hyndman, Sgt. Garcia, and Lt. Abraham entered the office, but the interrogation

was principally conducted by Fraser and Christopher.

48. At approximately 3:45 p.m. Commissiong lay down on a couch in the office to alleviate recurring back pain he often suffered after sitting for a lengthy period. He rested there for approximately forty-five minutes, and then he ate a Whopper that one of the police officers brought back for him at his request from Burger King.

### 6. Commissiong's Alleged Invocation of his Miranda Rights

49. Commissiong testified that at approximately 3:00 p.m. he telephoned John Stout, his attorney, and told him that things were not going well and that he thought he would shortly be placed under arrest.

50. Stout testified that he received such a call from Commissiong at some time after 3:00 p.m. and that he told Commissiong to tell the detectives that he did not wish to make any further statements or answer any further questions.

51. None of the detectives involved in the interrogation could recall Commissiong asking to telephone his attorney until early evening. Furthermore, none of the detectives could recall Commissiong telling them that he did not want to make any further statements or answer any additional questions.

52. There were several telephone calls between Stout and people at police headquarters during the afternoon.

53. Stout was very busy on a number of other matters during the afternoon.

54. Commissiong did not ask to call his lawyer until sometime in the early evening after he brought detectives to the gun barrel.

55. During the alleged 3:00 p.m. telephone call Stout did not ask Commissiong to let him speak with the detectives questioning him to tell them that Commissiong had nothing further to say.

56. Neither Stout nor any attorney from his office went to police headquarters until after the police arrested Commissiong sometime after 7:30 p.m.

57. Although Stout's billing record from May 4th specifically indicates a single telephone conference with Commissiong that day, the record does not pinpoint the time of the call.

58. Defendant's Memorandum of Facts and Law filed on July 20, 1988, in support of his suppression motion discusses his May 4, 1988, interrogation but makes no mention of any telephone call from Commissiong to Stout or any invocation of rights prior to Commissiong's arrest that evening.

59. Stout was likely confused about the time he spoke with Commissiong and was probably referring to a conversation he had with the defendant sometime after the police recovered the missing gun barrel and arrested the defendant that evening.

60. Even if Stout did talk with Commissiong at some time near 3:00 p.m., Commissiong never told the detectives questioning him that he did not wish to answer any further questions.

### 7. Recovery of the Missing Gun Barrel

61. While examining Commissiong's .357 Magnum, members of the forensic unit discovered that the gun's barrel was missing. Detectives Fraser and Christopher questioned the defendant about the location of the missing barrel.

62. Eventually Commissiong told them that he had been in the Bordeaux area target practicing two weeks before, the barrel was defective and cracked, and he threw it into a dumpster. But with continued interrogation Commissiong changed his story and indicated that he left the cracked barrel at the Bavoni dump.

63. Believing the missing barrel could still be in Commissiong's home, at approximately 5:00 p.m. Detective Christopher and Sgt. Garcia went to the Federal Building to meet with prosecutors in the U.S. Attorney's office to put together a search warrant application.

64. Magistrate Barnard signed a search warrant sometime after 7:00 p.m., but the police never executed it.

65. While Christopher and Garcia were in the nearby Federal Building, Detective

Fraser told Commissiong that the police were seeking a search warrant for his home.

66. Commissiong indicated his concern that a search would greatly disturb his elderly and ailing aunt, Ms. Thyra Hodge Smith. Fraser told him that if he cooperated a search would be unnecessary.

67. Commissiong eventually told Fraser that he would take him to the Bavoni dump and show him where he left the gun barrel.

68. At approximately 6:00 p.m. Detective Fraser and Commissiong left for the Bavoni dump along with Detectives Vialet and George, Lt. Blyden, and Officer Rampasad. The group travelled in two police vehicles, Commissiong in the vehicle driven by Fraser, which also carried Lt. Blyden and Officer Rampasad.

69. As Fraser drove toward the Bavoni dump, Commissiong gave him directions that took him away from the direction of the dump. The directions lead Fraser back toward Commissiong's home in the Hospital Ground area.

70. When they were near the Knud Hansen Hospital, Commissiong told Fraser to stop near a dumpster. The defendant exited the vehicle, walked to the dumpster, and went through its contents until he found a brown cardboard box labelled "Sunny Mountain Water."

71. Commissiong gave Fraser the box and told him it contained the barrel. Fraser saw that the barrel was in the box and he brought the barrel back to police headquarters.

72. Commissiong and the Department members accompanying him returned to the police station shortly after 7:00 p.m.

### 8. Commissiong's Arrest

73. At approximately 7:30 p.m. Lt. Abraham decided to place Commissiong under arrest, and the defendant was arrested sometime between 7:30 and 7:45 p.m.

74. At the time of his arrest Commissiong said, "Oh, my God, I can't believe I did this." Commissiong then asked for the first time to speak with his attorney.

75. Commissiong had no reason to believe that his liberty was restrained during the course of his lengthy interrogation. The court reaches this finding by considering several factors.

(a) Every detective involved in the interrogation testified that, although the defendant never asked, he was always free to leave.

(b) Commissiong went voluntarily to the Investigation Bureau to tell his story, and he remained there to discuss his story with the detectives.

(c) The detectives allowed him to use the water fountain and the bathroom on several occasions without an escort.

(d) Commissiong never once asked whether he could leave, and he had no reason to want to leave. His intention was to clear himself from all suspicion in the homicide that occurred the previous evening, and he wanted to leave the Investigation Bureau only after he had convinced his interrogators that he was not involved in that crime.

76. Any corrections made in documents prepared subsequent to Commissiong's arrest were made in good faith to reflect accurately the events that occurred. The testimony of several members of the Department highlighted the professional manner in which the Department conducted its investigation in this matter and explained minor errors in certain paperwork and the way in which those errors were conscientiously corrected.

### C. The Line-up

77. On the afternoon of May 26, 1988, the Assistant U.S. Attorney prosecuting Commissiong met with defense counsel to review photographs of potential participants in the next morning's line-up identification.

78. Commissiong's attorneys objected to three of the six potential line-up participants on the ground that they were much older than Commissiong. However, his attorneys agreed to waive their objections if all six would appear and two additional individuals, local attorneys, would be included in the array.

79. The following morning, May 27, 1988, Donna Lambert and another witness, Karen Driscoll, appeared at the police station to view the line-up.

80. Defense counsel were present at the line-up.

81. There were eight men in the line-up, including Commissiong, who was in the fourth position. (One expected participant failed to appear.)

82. The participants were all of similar overall appearance, although three were somewhat older than the defendant.

83. Ms. Lambert viewed the array first. While she viewed the men from behind a one-way piece of glass, the detective in charge of the line-up, concerned that she was afraid of getting too close to the glass, told her to step closer.

84. Ms. Lambert identified the defendant.

85. Shortly thereafter, Ms. Driscoll viewed the line-up, and she was also asked to move closer to the glass.

86. Ms. Driscoll failed to make an identification.

87. After the line-up session it became apparent that Donna Lambert recognized two of the participants in the line-up in addition to Commissiong as lawyers from the community. One of these individuals was also one of the participants who was somewhat older than Commissiong.

88. The line-up was not so suggestive that a witness would have identified Commissiong as the man she had seen even if he was not that man.

## II. CONCLUSIONS OF LAW

Congress has enacted a Bill of Rights applicable to citizens of the Virgin Islands that contains all of the rights set forth in the United States Constitution with the exception of the right to grand jury indictment. 48 U.S.C. § 1561 (1982 & Supp. III 1985). This statute "expresses the congressional intention to make the federal Constitution applicable to the Virgin Islands to the fullest extent possible consistent with its status as a territory." *In re Brown*, 439 F.2d 47, 51 (3d Cir.1971) (en banc). Commissiong claims that this court must suppress certain evidence on the grounds that (1) the search of his vehicle violated his fourth amendment rights; (2) he was unlawfully arrested and remained in custody for several hours before he was brought before a magistrate; (3) questioning continued after he allegedly invoked his *Miranda* rights; and (4) the line-up procedure was unconstitutionally suggestive. None of these claims has merit.

### A. *The Search of Commissiong's Vehicle*

██ When a police officer has a legitimate reason for being somewhere when he inadvertently sees incriminating evidence, a warrantless seizure does not violate the accused's fourth amendment rights. *See Coolidge v. New Hampshire*, 403 U.S. 443, 446–47, 91 S.Ct. 2022, 2027–28, 29 L.Ed.2d 564 (1971). *See generally* 3 W. LaFave, *Search and Seizure* § 7.5(a) (1987). This court has found that Sgt. Garcia was legitimately in Commissiong's car to accompany him to the police station when he inadvertently noticed blood spots between the bucket seats and hair in an air conditioning vent. Therefore, even if he had seized those items, that seizure would have been constitutional. However, he did not seize them, and he did not even communicate to Commissiong the fact that he had observed them. Instead, he reported his findings to other police officials.

██ Assuming, arguendo, Sgt. Garcia's conduct leading to his observation of the blood spots and hair was improper, that conduct did not taint the subsequent search of the defendant's vehicle because the police would have sought to search the vehicle even if that observation had not occurred. The court must determine " 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quot-

ing J. McGuire, *Evidence of Guilt* 221 (1959)). Where the evidence in question would inevitably have been discovered regardless of the prior illegality, there is no taint. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *see also United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986). *But cf. United States v. Hearn,* 496 F.2d 236 (6th Cir.) (holding in the alternative that where without earlier illegal search police would not have sought consent the consensual search is invalid), *cert. denied,* 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642 (1974). Commissiong and his vehicle were observed near the scene of a homicide, making him a suspect. As the court has found, sooner or later the police would have sought to examine the interior of the car, whether with his consent or with a search warrant. Therefore, even if Garcia's observations constituted an unconstitutional search, the subsequent search and seizure were valid.

■ In addition, Commissiong's consent was voluntary. An accused's consent to search is involuntary when, considering the totality of the circumstances, the defendant's will is overborne. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Drawing by analogy on the body of constitutional law involving voluntary confessions, the *Schneckloth* Court indicated that the following factors are significant—although not necessarily determinative—in considering whether the defendant's will was overborne: (1) the youth of the accused; (2) his lack of education; (3) his low intelligence; (4) failure to advise him of his *Miranda* rights; (5) the length of his detention; (6) the prolonged nature of questioning; and (7) whether he was deprived of food or sleep. *Id.* Commissiong's will was not overborne. None of these factors were present in this case. In addition, Sgt. Garcia's earlier search, even if unlawful, could not have affected the voluntary nature of Commissiong's consent. Commissiong never knew that Garcia had seen anything unusual, and therefore could not have been coerced into consenting by his belief that the police had already seen the evidence in his car. *See* 3 W. LaFave, *supra,* § 8.2(c).

**B. *Commissiong's Arrest***

■ A person has been arrested "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J., joined by Rehnquist, J.); *accord Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983). It is possible that, even where an individual has been at police headquarters for a lengthy period of time, there has been no arrest. *See California v. Beheler,* 463 U.S. 1121, 1124 n. 3, 103 S.Ct. 3517, 3519–20 n. 3, 77 L.Ed.2d 1275 (1983) (per curiam). This is likely to be the case where an individual has voluntarily appeared at police headquarters to convince officials of his innocence. *See United States v. Chaffen,* 587 F.2d 920, 923 (8th Cir.1978); *United States v. Vita,* 294 F.2d 524, 529 (2d Cir.1961), *cert. denied,* 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962). *See generally* 2 W. LaFave, *supra,* § 5.1(a), at 390–93.

Commissiong contends that he was arrested when Capt. Hyndman and Sgt. Garcia accompanied him to police headquarters, but such a contention has no merit. He voluntarily agreed to go with them so he could explain his story. Similarly, his contention that he was arrested at the time Detective Fraser read him his *Miranda* rights is similarly misconceived. Commissiong was advised of his rights out of an abundance of caution, and he was specifically told that he was not under arrest at that time. Commissiong continued to believe that he could convince the police of his innocence. He further contends that, at the very latest, he was under arrest when he returned to police headquarters after retrieving his .357 Magnum from his home. However, even at that point in the interrogation a reasonable person in Commissiong's position would not have believed that he was being detained. At this time Commissiong still hoped to convince the police of his innocence. He never asked whether he was free to leave; moreover, he

was never physically restrained and he was permitted to go to the water fountain and the bathroom without escort. Commissiong was arrested—and was given grounds on which a reasonable person would believe he was being arrested—only after the police recovered the gun barrel, the point at which Commissiong knew he could no longer convince authorities of his innocence. Because Commissiong was not actually arrested until approximately 7:45 p.m. on May 3rd, his claim that evidence obtained earlier in the day should be suppressed on the grounds that he was not taken before a magistrate in a timely fashion has no merit.

### C. Continued Interrogation after Commissiong's Alleged Invocation of his Miranda Rights

#### 1. The Validity of Commissiong's Written Waiver

■ For a defendant's waiver of his *Miranda* rights to be valid, the government must meet a "heavy burden ... to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). The factors that this court must consider to determine whether Commissiong's written waiver of his *Miranda* rights was voluntary are the same factors that it considered in determining the voluntary nature of his consent to the search of his vehicle. These factors come from *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), where the Supreme Court discussed circumstances in which a waiver of fourth amendment rights by consent was voluntary by drawing on the law regarding waiver of fifth amendment rights. As in the fourth amendment context, the court here must determine from the totality of the circumstances whether the defendant's will was overborne. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). However, in this context the court must determine not only whether the waiver of rights was voluntary, but whether it was

knowing and intelligent. *Schneckloth*, 412 U.S. at 231–32, 93 S.Ct. at 2049–50; *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628.

For the same reasons that Commissiong's consent to the search of his car was voluntary, his waiver of his *Miranda* rights was knowing and intelligent. None of the *Schneckloth* factors are present in this case. Moreover, the conduct of defendant's attorney on the morning of the interrogation indicates that defendant's awareness was unaffected by his use of crack the previous day. Finally, a knowing and intelligent waiver is consistent with defendant's actions on the day of the interrogation, all of which indicate that he voluntarily went to his lawyer and then to the police station to convince authorities of his innocence.

#### 2. Commissiong's Alleged Invocation of his Miranda Rights

■ Authorities must cease questioning an individual once he invokes his *Miranda* rights. *Miranda*, 423 U.S. at 473–74, 86 S.Ct. at 1627–28; *see also Michigan v. Mosley*, 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975). *See generally* 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.9(g) (1984). However, this rule has no application in the present case because the court has found that Commissiong did not invoke his rights until after his arrest at approximately 7:45 p.m. The court has found that the evidence did not support defendant's assertion that he phoned his attorney and, on his attorney's advice, invoked his *Miranda* rights before taking the police to the missing gun barrel. Moreover, even if the defendant had spoken with his attorney before assisting the police in finding the barrel, he did not invoke his rights.

### D. The Validity of the Line-up Identification

■ The constitutional validity of a line-up identification depends upon the totality of the circumstances and a court must determine whether the identification "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the

accused] was denied due process of law." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Line-ups generally do not violate a defendant's due process rights unless they are so suggestive as to all but assure that the witness will identify the suspect. *Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969). Courts have loosely applied this due process standard. *See* 1 W. LaFave & J. Israel, *supra,* § 7.4(d), at 587 & nn. 48 & 49 and cases cited therein. Specifically, courts do not generally find line-ups constitutionally infirm where arrays contain some individuals of dissimilar appearance or dress. *See, e.g., Martin v. United States,* 462 F.2d 60, 62 (5th Cir.) (differences in age), *cert. denied,* 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972); *United States v. Hines,* 455 F.2d 1317, 1329 (D.C. Cir.) (differences in size and age), *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972).

Commissiong appeared in a line-up array of eight individuals of similar overall appearance, although three of the individuals were somewhat older than he. In addition, one witness, Donna Lambert, recognized two of the participants from the community. However, there is no dispute that Ms. Lambert identified the defendant out of a group of at least four individuals of Commissiong's age whom she did not already know. Under the totality of the circumstances, such an identification from a four-person line-up would not have violated defendant's due process rights. Moreover, inclusion in the line-up of participants of varying ages did not present a constitutional infirmity, so Ms. Lambert really chose Commissiong from a group of six unfamiliar individuals. Finally, considering the totality of the circumstances, Ms. Lambert's position in the line-up room and the fact that she was asked to step closer to the glass did not render the line-up unconstitutionally suggestive.

## III. CONCLUSION

The evidence that the government and the defendant presented to this court during the three-day suppression hearing contained several inconsistencies. However, the court has carefully weighed the totality of the evidence and the credibility of the witnesses and has set forth its findings of fact. The court has also set out the applicable legal principles and has applied them to the facts. Based upon the foregoing factual findings and conclusions of law, the court has determined that the Virgin Islands Police Department did not violate Keith Commissiong's constitutional rights in obtaining certain evidence to use against him in this court, and therefore his suppression motion must be denied.

An appropriate order will be entered.