UNITED STATES of America, Plaintiff,

v.

Carol LEWIS, Defendant.

No. 89–CR–706 (ERK).

United States District Court,
E.D. New York.

Aug. 6, 1990.

David Breitbart, New York City, for plaintiff.

Rona Wittels, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## CORRECTED MEMORANDUM AND ORDER

KORMAN, District Judge.

After a jury trial, the defendant was convicted of smuggling marijuana into the United States. She now moves for reconsideration of the denial of her pre-trial motion to suppress evidence seized from her apartment. The relief the defendant seeks is compelled by *United States v. Sanchez*, 635 F.2d 47 (2nd Cir.1980). In *Sanchez*, the defendant filed a pre-trial motion to suppress evidence seized from his apartment on the ground that he had not voluntarily consented to the search. The district court discredited the defendant's "deliberately ... false testimony" that he "said nothing" when asked for permission to search, and credited the federal officer's testimony that the defendant's response to his request had been " 'Go ahead and look. You won't find anything.' " *Id.* at 61. Based on this testimony, and on the defendant's "arrogant and intrepid" attitude at trial, the district court concluded that the

defendant "was not intimidated, not threatened, not mislead (sic), and was given no cause to fear brutality or other uncivilized behavior by the officers." *Id.*

On appeal from the denial of the motion to suppress, the Court of Appeals held that the district court's findings, although not "clearly erroneous," were inadequate because the district court apparently did not consider whether "the circumstances of [the defendant's] detention ... may have led him to believe that the officers had the right and the intention to search his apartment even if he did not consent." *Id.* It also held that, since the defendant "did not testify that he [orally consented to the search] because he felt he had no choice[,] ... it [is] not clear ... that the circumstances reflected in the present record compel [the] conclusion" that his consent was involuntarily given. *Id.* Consequently, the Court of Appeals remanded the case for further proceedings consistent with its opinion:

> [T]he finding before us that Sanchez was neither threatened nor intimidated does not in light of the circumstances under which his alleged consent was obtained, establish that his consent was voluntarily given. What is lacking is explicit consideration by the trial judge as to whether or not Sanchez, believing the officers were going to enter regardless of what he said, merely submitted to their authority. We therefore remand to the district court for additional findings of fact and for reconsideration of whether the prosecution carried its burden, in light of the proper standard. If the district court finds, in light of "the totality of all the circumstances," that Sanchez voluntarily consented to the search, and not that he merely bowed to what he reasonably viewed as the exercise of authority, new judgments of conviction should be entered against Sanchez and Alvarez. If, on the other hand, such a voluntary consent is not found, the motion to suppress the items seized in Sanchez's apartment

should be granted [and] a new trial should be ordered as to Sanchez....
*Id.*

This holding is particularly relevant to the defendant's pending motion for reconsideration of the denial of her pretrial suppression motion. Like the district court in *Sanchez,* after discrediting the defendant's testimony regarding the circumstances under which her consent to search her apartment was obtained, I did not consider whether these same circumstances could have led her to believe that the officers were going to search regardless of what she said or of her signature on the consent form.

After carefully reviewing the evidence in light of the circumstances that preceded the execution of the consent form, I find that the United States Attorney has not met the burden of proving that the defendant's consent was voluntary. Accordingly, for the reasons that follow, the defendant's post-trial motions for reconsideration of the denial of her suppression motion and for a new trial are granted.[1]

## (I)

The facts, as testified to at the suppression hearing and at trial by the Customs Service Agents, may be summarized as follows: The Customs Service obtained a warrant to arrest the defendant for importing approximately two hundred pounds of marijuana into the United States. The marijuana was contained in luggage that the defendant did not retrieve after she had arrived in New York from Jamaica on September 3, 1989.

On September 7, 1989, at 7:00 a.m., approximately half a dozen Customs Service Agents knocked on the door of the apartment that the defendant occupied with her young son and her father. The defendant's son opened the door and the Customs Service Agents, with guns drawn, Tr. 54,[2] entered the apartment and conducted a security sweep. While the record is unclear

---

1. Such reconsideration is not precluded by the law of the case doctrine. *United States v. Birney,* 686 F.2d 102, 107 (2nd Cir.1982); *see In re United States,* 733 F.2d 10, 13 (2nd Cir.1984).

2. All references to the record are to the Transcript of the Suppression Hearing, January 18, 1990, unless otherwise noted.

where the agents first encountered the defendant, within minutes after their entry, Special Agent Alexander found the defendant seated in the hallway of the apartment.[3] The defendant "was slightly agitated, as anyone would be when they had federal agents enter their house with an arrest warrant" at 7:00 a.m. Tr. 8. Special Agent Alexander and Special Agent Matula succeeded in calming the defendant down "so that she would be able to understand her *Miranda* rights and coherently deal with the situation." Tr. at 8–9.

After the defendant was advised of her *Miranda* rights, Special Agent Dalessandro "asked [the defendant] if she understood her rights, and whether it was okay to look through her apartment." Tr. 23. The defendant indicated that she understood her *Miranda* rights and "when asked [if the agents could] look around [her] apartment[,] ... [s]he said, yes." *Id.* While this conversation was taking place, the other agents "were scattered through the living room [and] in the hallway." Tr. 24.

At about 7:30 a.m., Special Agent Dalessandro asked the defendant for identification. Trial Tr. 70, 73. The defendant replied that the identification was in her bedroom. According to Special Agent Dalessandro, he "escorted her into her bedroom, and she went between the night table and her bed and started to reach for two handbags, at which time [he] took control of the handbags for safety reasons, and [he] also observed a beeper on her night table, which [he] also took." Tr. 25–26.

After they walked back into the hallway, Special Agent Dalessandro "emptied the contents of the bags on to the floor[,]" Tr. 57, and seized the cash and documentary evidence that comprised the contents. While the bags were being searched and their contents seized, other agents had

"walked into the bedroom and picked up identifying [labels from] other pieces of luggage." Tr. 59.

Special Agent Dalessandro has consistently failed to offer a rational explanation for why he felt compelled to empty the bags after he seized them. At the suppression hearing, when asked why he "didn't wait for a consent form before dumping the contents of these bags[,]"[4] Special Agent Dalessandro responded, "Yes, safety." Tr. 57. When I asked him "[w]hy was it necessary to open them for safety reasons[,]" Special Agent Dalessandro answered, "There was myself and another agent standing there, and I don't recall who opened what or po[u]red (sic) what out, but we just emptied it out."[5] Tr. 70. Then, when asked at trial why he emptied the bags, Special Agent Dalessandro responded, "Because I did." Trial Tr. 83–84. The following colloquy then ensued between the agent and the defendant's attorney:

Q: Was it for safety and security reasons?

A: To examine the contents

. . .

Q: Isn't [it] a fact, you told this court you [emptied the bags] for safety and security reasons?

A: For safety and security, she had already given oral consent.

Trial Tr. 84.

The defendant was first presented with a consent to search form at 9:30 a.m. Tr. 32. By that time, the agents had already conducted a security sweep of the apartment and had seized "[the defendant's] beeper, the contents of her two handbags, two photographs, and ... some baggage tags that were affixed to two or three suitcases that were in the apartment." *Id.* Special Agent Dalessandro explained that all this took place prior to the execution of the

---

**3.** Special Agent Alexander testified that the hallway was "L-shaped ... with a living room, bedroom, kitchen and bathroom off-shoot to the side." Tr. 7.

**4.** The Customs Service Agents did not bring a consent to search form with them to the defendant's apartment when they executed the arrest

warrant. It was not until two and a half hours after they entered the apartment that one was delivered.

**5.** The defendant testified, without contradiction, that "you [could] feel a weapon if you patted the bags down." Tr. 12, January 19, 1990.

consent to search form because the defendant's affirmative response to his question whether it "was okay to look around her apartment" constituted "in his mind ... a knowing and intelligent waiver," Trial Tr. 77–78, that gave him the right to search before the consent form arrived and before the defendant was advised that she could refuse to consent to the search. Trial Tr. 79.[6]

### (II)

After the suppression hearing and prior to trial, I ruled that the defendant's affirmative response to the request of Special Agent Dalessandro for permission "to look around" did not constitute "a consent to search anything." Tr. 4, January 31, 1990. I did not suppress the evidence found in the defendant's pocketbooks and other evidence seized prior to the signing of the consent form on the basis of the following findings:

I don't believe that that amounted to a consent to search, but it is not clear to me that they found anything pursuant to that "look around."

As I understand the evidence, and you can correct me if I am wrong, the first major piece of evidence that was found was when the agent asked for identification, asked the defendant whether she had any identification and then she took them to the bedroom and she reached for those two pocketbooks. Then he took the pocketbooks ... I think he said he took them into the living room and emptied them for security reasons.

Quite frankly, I don't know how security reasons justify that. I mean, he had physical custody of the pocketbooks. It is not clear to me how emptying them out, particularly emptying them out on the floor like that, necessarily furthered any security concerns that the agent may have had.

On the other hand, [the defendant] subsequently did consent to the search of the apartment. They read her the consent to search form. She signed it. I don't believe the [defendant's] testimony that she was laying on the floor and they made her sign it on the floor with a gun to her head.

There is no evidence ... to conclude that she did't understand what she was signing ... there is no evidence from her ... because of the way the testimony has come out, and what I think is simply not an accurate version of what's happened from her, there is nothing to suggest that that consent was in any way involuntary or that I should set it aside on the grounds that it is involuntary.

It seems to me that, again, subject to whatever arguments you want to make, that one could argue that they would have inevitably found what was in the pocketbook pursuant to the consent that was subsequently obtained even if the initial search of the pocketbook was invalid.

Tr. 4–5, January 31, 1990.

■ In reaching the conclusion that the consent given at 9:30 a.m., when the defendant signed the consent form, was voluntary, and that the search conducted pursuant to it would have inevitably led to the discovery of the items that were previously seized without consent, I did not consider the effect that the prior illegal conduct may have had on the defendant's decision to sign the form.[7] After giving consideration to the nature and extent of the search

---

**6.** Special Agent Dalessandro could not "recall" whether the defendant had been advised that she could withhold her consent. *Id.* This was one of a number of issues regarding the search and seizure to which Special Agent Dalessandro exhibited a disturbing lapse of memory during trial.

**7.** If the consent was voluntary and untainted, there is some support for the applicability of the inevitable discovery rule in this context, *cf. Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529,

2534, 101 L.Ed.2d 472 (1988); *United States v. Tortorello,* 533 F.2d 809, 815 (2nd Cir.), *cert. denied.* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); *Government of the Virgin Islands v. Commission,* 698 F.Supp. 604, 611–12 (D.V.I. 1988), although there is authority to the contrary. *See United States v. Carson,* 793 F.2d 1141, 1155 n. 2 (10th Cir.), *cert. denied.* 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986); *United States v. Melendez–Gonzalez,* 727 F.2d 407, 414 (5th Cir.1984).

and seizure that preceded the execution of the consent form, combined with the armed entry of half a dozen Customs Service Agents at 7:00 a.m. and the arrest of the defendant, I conclude that a reasonable person in the defendant's position would not have felt that her consent to search was material. Stated another way, I find that the United States Attorney has failed to demonstrate that the consent to search was not a submission to the authority to search and seize that the Customs Service Agents had already exercised to a significant degree. *See Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Indeed, in light of Special Agent Dalessandro's trial testimony, that he construed a consent to look around the apartment as a knowing and intelligent waiver that gave him the right to search, I am not persuaded that the Customs Service Agents actually waited until the consent form was signed at 9:30 a.m. before conducting a full blown search of the apartment.

### (III)

■ The only issue that remains is the claim of harmless error asserted by the United States Attorney. The evidence seized from the defendant's pocketbook included some $1,723.00 in cash and an airline ticket that conclusively established that she had been the Carol Lewis who was on the flight from Jamaica and to whom the marijuana-filled luggage belonged. Although the evidence against the defendant, aside from this contested evidence, included the luggage filled with marijuana, an eyewitness identification and a full post-arrest confession, the Assistant United States Attorneys who were trying the case, Ms. Wittels and Mr. Lato, initially insisted that the evidence seized from the defendant's apartment was critical to their case:

MS. WITTELS: We are only in a position to open on the defendant's confession.
THE COURT: That is a terrible weakness that you have to open on.
MR. LATO: In the mind of the jury they may feel all the things were done, why

isn't there any evidence that she took the flight independent of the police officer's statement, why aren't there tickets?
MS. WITTELS: Where is the other suitcase? It was in her apartment. I think those are reasonable questions the jury may wonder about. I think it is important to establish she checked the bags on the flight and she left the bags for someone else to take off the airplane.

The second suitcase is in her apartment. I think it is key and not cumulative. Where is the independent evidence she was actually on this flight?
MR. BREITBART: I understood a Customs inspector is going to testify that he identified her as the individual that got off the plane.
MS. WITTELS: I assume you are going to impeach—I don't think we have to rely on eyewitness testimony that long ago when we have documentary evidence. I don['t] thin[k] (sic) Mr. Breitbart is going to waive cross-examination, he is going to try to make them think he doesn't remember.

Tr. 4–5.[8] In her summation, the Assistant United States Attorney again emphasized the importance of the items seized by Special Agent Dalessandro. She argued to the jury:

You heard from special agent Dalessandro. Special agent Dalessandro was the case agent on this case. He was basically responsible for the investigation. He told you what he recovered from the defendant's own pocketbook only four days after this flight.

Ladies and gentlemen, that is Government Exhibit 16. And that is an airline ticket, and the boarding pass on that ticket is very, very clear. It indicates that C. Lewis boarded flight 011 on September 3, 1989, and she was bound for JFK Airport. That is exactly what the boarding pass says. Inside you will also see there are luggage tags in there and we will discuss those, and also an airline ticket dated September 2nd

.    .    .    .    .

---

8. The citation is to an excerpt of the proceedings on the day that the trial began.

What else was found in the defendant's apartment? Two additional luggage tags from flight 011 on September 3rd with the name M. Brown. Two other suitcases in the defendant's apartment from which the agents removed the sticker indicating that M. Brown, ... a sister of the defendant, was also on that flight on September 3rd and she too has two bags.

Summation Tr. 36–37, 44–45.

Under these circumstances, while I believe that there is sufficient evidence to sustain a conviction without the fruits of the search of the defendant's apartment, I cannot conclude on this record that the evidence was harmless beyond a reasonable doubt. Accordingly, the motions to suppress and for a new trial are granted.

### (IV)

■ I wish to make clear that I am now suppressing only the evidence seized in the defendant's apartment and the remarks that she made immediately in response to questions directed to its contents.[9] On the present record, I do not agree that the defendant's confession must be suppressed as the fruit of an illegal search. The defendant's arrest was pursuant to a valid warrant issued prior to the search and the confession was made after the search and after the defendant was removed from the apartment. She was fully advised of her rights and the confession was an entirely voluntary one. Moreover, there is no evidence that the Customs Service Agents used or referred to the evidence found in the apartment in questioning her.[10] See Y. Kamisar, W. LaFave, J. Israel, *Modern Criminal Procedure* 752 (7th ed. 1990)

("[C]onfronting a suspect with illegally seized evidence tends to induce incriminating statements by demonstrating the futility of remaining silent, and thus the warnings have even less of an impact in such a situation than in the case of an illegal arrest...."). Indeed, the defendant either denied or could not recall making any of the statements attributed to her.

■ While there is support for a rigid application of the exclusionary rule to suppress any confession made after an illegal seizure, 4 LaFave, *Search and Seizure* § 11.4(c) (1987), the Supreme Court has declined to adopt such a rule in confession cases and in other analogous contexts. *See e.g. United States v. Cecollini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). On the contrary, the issue of the admissibility of defendant's confession should turn on whether it is sufficient for deterrent purposes to suppress the evidence seized pursuant to a defective consent search and the statements that are immediately attributable to it. *See United States v. Leon*, 468 U.S. 897, 910, 104 S.Ct. 3405, 3413, 82 L.Ed.2d 677 (1984); *United States v. Cecollini*, 435 U.S. at 275–276, 280, 98 S.Ct. at 1059–1060, 1062; *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). As Justice Stevens aptly stated it:

These holdings make it clear that taint questions do not depend merely on questions of causation; causation is a necessary but not a sufficient condition for exclusion. In addition, it must be shown that exclusion is required to remove the incentive for the police to engage in the unlawful conduct. When it is, exclusion

---

9. It may be that some of the evidence seized in the defendant's apartment is admissible if it was found during the security sweep, if the security sweep was proper under the holding in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 1098–99, 108 L.Ed.2d 276 (1990), and if the evidence was "in plain view." *See Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). If the United States Attorney wishes to press this argument, a memorandum of law directed to this issue should be filed before the start of the second trial.

10. In her summation, the Assistant United States Attorney argued that, after the defendant

had initially denied having been to Jamaica, "Agent Dalessandro finds her airline ticket in her pocketbook which shows we have proof she has been there. What does she do? Starts telling us precisely what happened." Summation Tr. 46. The testimony at the suppression hearing and trial does not support the suggestion made by the Assistant United States Attorney that the discovery of the airline ticket induced the defendant's confession. Because she suggested that it did, the issue requires further exploration before the second trial.

is mandated if the Fourth Amendment is to be more than "a form of words." *Segura v. United States*, 468 U.S. 796, 830, 104 S.Ct. 3380, 3398, 82 L.Ed.2d 599 (1984) (Stevens, J. dissenting).

When a confession is obtained after the unlawful seizure of the defendant, it is normally excluded even when the methods used to obtain the confession did not violate the Self–Incrimination Clause. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Because such seizures are usually made for the very purpose of obtaining a confession, it would seriously undermine "the effect of the exclusionary rule in deterring illegal arrests" if such confessions were admitted. As Justice Blackmun observed in *Brown v. Illinois:*

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."

422 U.S. at 602–03, 95 S.Ct. at 2261 (footnote and citations omitted).

Cases such as the present one, where a confession is obtained after an illegal search and seizure of tangible evidence, are materially different from cases in which a confession is obtained following an illegal arrest. A search is not usually undertaken to obtain evidence that would be used to induce a defendant to confess to a crime. Rather, the purpose of a search is to find physical evidence of criminal activity that can be used against the defendant at trial. The fact that highly incriminating physical evidence will be suppressed if obtained as the result of an illegal search should suffice to deter misconduct. Accordingly, because "the incremental deterrent value [of doing so] would be minimal," there is no need to go so far as to suppress a voluntary statement made some hours later when the defendant was lawfully in custody and where there is no evidence that fruits of the unlawful search were impermissibly exploited during the interrogation.[11] *See New York v. Harris*, —— U.S. ——, 110 S.Ct. 1640, 1644, 109 L.Ed.2d 13 (1990).[12]

Because the issue of whether the illegally seized evidence was used to induce the defendant's confession was not fully explored at the suppression hearing or at trial, and because the Assistant United States Attorney argued in her summation that the defendant confessed only after being confronted with such evidence, it would not be appropriate to conclusively resolve this issue before the parties have had the opportunity to address it. *See Fahy v. State of Connecticut*, 375 U.S. 85, 91, 84 S.Ct. 229, 232, 11 L.Ed.2d 171 (1963).

SO ORDERED:

---

**11.** If the search was undertaken for the express purpose of obtaining tangible evidence to be used in providing a confession, then clearly the confession should be suppressed.

**12.** *New York v. Harris, supra,* did not directly address the issue whether a confession that was obtained after the illegal seizure of physical evidence must be suppressed. The issue in *New York v. Harris* was whether a confession that was obtained after the warrantless arrest of the defendant in his home should be suppressed. Much of the reasoning in *New York v. Harris,* however, is applicable here.