**Rainford "Teddy" THOMPSON a/k/a Rainford Thompson, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Misc. Civ. No. 89–613M–01.**

United States District Court,
W.D. New York.

April 15, 1993.

---

Jonathan Feldman, Fed. Pub. Defender, Rochester, NY, for plaintiff.

Bradley E. Tyler, Asst. U.S. Atty., Rochester, NY, for defendant.

## ORDER

TELESCA, Chief Judge.

In advance of any grand jury proceedings, Rainford Thompson (defendant in the underlying criminal complaint and plaintiff in this action) seeks return of, and moves to suppress evidence of, items of personal property seized during a warrantless search of his apartment (# 6) at 132 S. Union Street in the City of Rochester on February 18, 1989. Mr. Thompson also moves to suppress statements the government claims he made to an Immigration and Naturalization Service ("INS") agent on the date of the warrantless search, and statements he made to another INS agent on March 15, 1989.

By Order dated September 17, 1992 and filed on September 24, 1992, this Court referred Mr. Thompson's motion to United States Magistrate Judge Kenneth R. Fisher. On November 17, 1992 Magistrate Fisher issued a Report and Recommendation regarding Mr. Thompson's motion. On November 25, 1992 Mr. Thompson filed timely objections to the Magistrate's Report and Recommendation. On January 15, 1993 Mr. Thompson supplemented these objections. On February 10, 1993, the Government filed its response to the initial objections and to the supplemental objections.

In his Report and Recommendation, Magistrate Fisher recommended that this Court: (1) exercise its discretionary jurisdiction to decide the matters before the court; (2) suppress and return all of the items seized from defendant's apartment # 6 at 132 S. Union Street; (3) suppress defendant's statements to INS Special Agent McLaughlin on February 18, 1989, on Fifth Amendment *Miranda* grounds only; and (4) deny defendant's motion to suppress defendant's statements to INS Special Agent Hoelter on March 15, 1989. Magistrate Fisher also recommended that, in accordance with the prescriptions of *Standard Drywall, Inc. v. United States,* 668 F.2d 156, 157 n. 3 (2d Cir.), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982), the Clerk open a Miscellaneous Civil file under the caption hereof, and transfer Mr. Thompson's motion papers, the government's response together with the referral order and his Report and Recommendation to the new file.

After a careful review of the Magistrate's Report and Recommendation and having duly considered the arguments presented by Mr. Thompson in his objections and supplemental objections to the Magistrate's Report, I adopt the Report and Recommendation in its entirety essentially for the reasons therein. In addition, it is hereby ordered that all additional documents regarding the Magistrate's Report, including those submitted by the parties and this Order, shall also be transferred to the above mentioned Miscellaneous Civil file.

ALL OF THE ABOVE IS SO ORDERED.

## REPORT AND RECOMMENDATION

FISHER, United States Magistrate Judge.

The defendant (referring to the defendant in the underlying criminal complaint—the title of this action is reversed for the reasons stated in fn. 2, *infra*) is charged by a criminal complaint with falsely representing himself to be a citizen of the United States, in violation of 18 U.S.C. § 911, and with making

false statements to a federal officer concerning a material matter within the jurisdiction of a United States agency, in violation of 18 U.S.C. § 1001. After a lengthy preliminary examination on August 3, 1992, the defendant was held to answer in district court pursuant to Fed.R.Crim.P. 5.1(a).

In advance of any grand jury proceedings, defendant seeks return of, and moves to suppress evidence of, items of personal property seized during a warrantless search of his apartment (# 6) at 132 S. Union Street in the City of Rochester. That search took place immediately after defendant's arrest in connection with an undercover purchase of ½ ounce of cocaine in the hallway outside apartment # 6 during the evening of February 18, 1989. Removed were defendant's wallet and a Virgin Islands birth certificate. Defendant also moves to suppress statements the government claims he made to an Immigration and Naturalization Service ("INS") agent on that date, and statements he made to another INS agent much later, on March 15, 1989. These statements are the basis of the criminal complaint.

The defendant contends that these motions will have a "potentially dispositive effect … on the defendant's rights and plea options as well as the Government's ability to proceed with the prosecution of this case, [and] the Government has agreed to delay presentation of this matter to the Federal Grand Jury until after this motion has been determined by the Court." Feldman affidavit ¶ 5, at 2–3. Without addressing the substance of defense counsel's statement, the government merely states that "[t]he jurisdiction of the Court to consider the defendant's motion pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure is not contested." This motion was referred to me by Chief Judge Michael A. Telesca by Order dated September 17, 1992, and filed September 24, 1992.

### A. Testimony at the Hearing

In addition to the wallet and identification documents found during the search of defendant's apartment, there are two statements which defendant moves to suppress. The first statement, in which defendant claimed U.S. citizenship by virtue of birth in the Virgin Islands, was made to an INS agent on the day of defendant's arrest for selling cocaine to an undercover officer. The second statement was made nearly a month later to another INS officer who was conducting a follow-up investigation at the jail. The first was made without *Miranda* warnings. The second was made after a full waiver of *Miranda* rights. Although defendant concedes the voluntariness of each statement, he claims that they were made as a result of the unlawful search of his apartment, that the first must also be suppressed under *Miranda*, and he contends that the second statement was a product of the unwarned first statement. He also contends that the second statement was obtained in violation of his *Miranda*-right-to-counsel and certain ethical rules applicable to attorneys. The government concedes that the wallet and identification documents must be suppressed as the fruit of a warrantless search not justified by exigent circumstances. It has further represented that it cannot prosecute defendant if both statements are suppressed.

### 1. The First Statement

Special Agent Michael John McLaughlin of the Immigration and Naturalization Service and Rochester Police Officer Kenneth Mann each testified that, on February 18, 1989, they were working together as part of a "Jamaican Organized Crime Squad." In addition to their interest in illegal narcotics trafficking, the squad was on the lookout for Jamaican citizens illegally present within the United States. Before they encountered the defendant that evening, these officers had arrested another individual who had turned state's evidence and had become an informant. The informant said he was willing to "give up" his supplier, and arrangements were immediately made to attempt a controlled buy of cocaine from the defendant.

McLaughlin testified that he went to defendant's apartment at 132 South Union Street at about 9 p.m. When he, Morris and Mann arrived, McLaughlin stayed outside while Morris and Mann went in to the main vestibule or hallway of the apartment building. According to Mann's testimony, the cocaine transaction occurred there. When de-

fendant was arrested, a scuffle ensued. The officers finally secured the defendant on the ground outside the building. Morris and Mann both testified that the key to defendant's apartment was found in one of his pockets at the time of his arrest, and that Morris went up to the apartment with some other officers where a search was conducted. But McLaughlin's and Mann's testimony concerning the subsequent events differs in many respects.

McLaughlin maintained that he went upstairs to the apartment with Morris and Mann while the defendant was detained downstairs. McLaughlin maintained further that defendant appeared in the apartment doorway with a uniformed officer a very short time after McLaughlin himself entered. When McLaughlin went into the living room of the apartment, he observed another woman, Anne Marie Kerr, lying or sitting on a mattress. While the search was taking place, McLaughlin talked to Kerr, who stated that she was a Canadian citizen. McLaughlin testified that he then turned to the defendant and, without any advisement of rights, asked his name and his citizenship. Defendant said he was Rainford Thompson and that he was from the Virgin Islands. McLaughlin testified that he had no information concerning the defendant at that time. The search, according to McLaughlin, had not yet been completed. It was only later that the wallet containing the defendant's Virgin Islands birth certificate was discovered. McLaughlin testified that these documents were found "quite awhile after" he spoke with defendant. The wallet, which was found by the mattress either on the floor or under a pillow, was displayed to McLaughlin by Officer Mann, who pointed out the identification documents found within. The documents were secured by a Rochester Police Department officer and kept with defendant's belongings at the Monroe County Jail.

Officer Mann remembered the events at the apartment that evening somewhat differently. Mann testified that, after the defendant was secured on the ground after the scuffle, he placed defendant in a squad car. Mann testified that the defendant never went back to the apartment, and that he did not see McLaughlin in the apartment. According to Mann, McLaughlin was in the hallway while Rochester Police officers were searching the apartment. Mann confirmed, however, that Anne Marie Kerr was in the apartment and that a birth certificate and a marriage license were found during the search.

The defendant, for his part, testified that he was arrested in the lobby near his apartment and was taken to the police car by Officer Mann. Defendant testified that he was never taken back upstairs, and that McLaughlin didn't interview him until he arrived downtown at the stationhouse after the arrest. The defendant testified that he was not questioned before he was put in the police car, and that he was not questioned in the car on the way downtown to the stationhouse. The defendant stated that he was taken to a 6 foot by 6 foot room and locked up, after which an INS officer came in by himself, told defendant who he was, and asked defendant his name, date of birth, and place of birth, "for INS purposes." The custody log, however, does not corroborate this version; it does not show that McLaughlin was in defendant's presence while defendant was at the stationhouse.

## 2. *The Second Statement*

A few days after the events on February 18, 1989, Special Agent McLaughlin ordered an investigation of defendant's citizenship. McLaughlin doubted defendant's claim to U.S. citizenship and he specifically doubted the authenticity of the Virgin Islands birth certificate found in defendant's wallet. INS Special Agent Peter Frederick Hoelter was asked to investigate the authenticity of the certificate, which at that time was in the possession of the Monroe County Jail. Someone at INS (initials "VDS")[1] attempted to procure a copy of the certificate from the Monroe County Jail on March 3, 1989. The Monroe County Jail refused to release the certificate in the absence of a court order or defendant's permission.

Before Hoelter could pursue the matter, however, attorney Fred S. Gallina, Esq. filed

---

1. The transcript of the preliminary examination reveals that it was Special Agent Salvatore.

an INS Form G–28 ("Notice of Entry of Appearance as Attorney or Representative"). Gallina was assigned in Rochester City Court to represent defendant in connection with the cocaine charges. The notice identified Gallina as a member in good standing of the New York Bar and it contained defendant's consent under the Privacy Act of 1974 for INS record disclosure to Gallina. Hoelter contacted Gallina on March 15, 1989, and spoke of his need to interview defendant, who was then detained in the Monroe County Jail on the cocaine charges. Hoelter told Gallina that defendant was in possession of a "suspect Virgin Islands birth certificate" at the time of his arrest, and that he wished to obtain a copy for his investigation of its authenticity.

The record contains conflicting evidence of the Gallina–Hoelter conversation. First, Hoelter maintained in his preliminary examination testimony, and the government maintains on this motion, that he called Gallina in advance to request permission for the Thompson interview. Hoelter does not state, however, and the government does not now maintain, that the requested permission was ever given. Instead, the government merely states: "Neither as part of this telephone conversation or at any time thereafter, did Fred S. Gallina tell Special Agent Hoelter that he could not interview Thompson." Government's Response, at 3. Hoelter's contemporaneous memorandum of the conversation did not even touch on the subject of permission; it states that "Gallina was advised that subject needed to be interviewed by INS ..." and that "INS wanted a copy" of the suspect birth certificate. Gallina asserted in his affidavit that he did not give permission for the interview, and he speculated that defendant might have already been interviewed by Hoelter. The conflict is not material, however, as will be shown below.

The jailhouse interview occurred at 4:30 p.m. that day, November 15, 1989. Defendant was advised of his rights in writing and he signed a waiver form (INS Form I–214). Defendant declared again that he was a United States citizen by reason of his birth in the Virgin Islands. Defendant gave a written release to Hoelter which permitted the INS to obtain a copy of the suspect Virgin Islands birth certificate.

**B. Jurisdiction to Hear Motion to Suppress**

Jurisdiction to consider the suppression of physical evidence issue is based on Fed.R.Crim.P. 41(e). With respect to the motion to suppress defendant's statements, the parties have evidently predicated jurisdiction on *In re Fried,* 161 F.2d 453 (2d Cir.1947), *cert. denied,* 331 U.S. 858, 67 S.Ct. 1751, 91 L.Ed. 1865 (1947). *See also, Grant v. United States,* 282 F.2d 165, 168 (2d Cir. 1960). In *Fried,* the majority of the panel expressed the view that a motion to suppress an illegally obtained confession may be made in the pre-indictment stage. *In re Fried,* 161 F.2d at 458–60 (Frank J.); *Id.* 161 F.2d at 465 (L. Hand, J., concurring on the ground that there should be symmetry in treatment between fourth and fifth amendment suppression issues in the pre-indictment stage).

Since *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), which held that the Fourth Amendment exclusionary rule does not extend to grand jury proceedings, the district courts within this circuit have divided on the standard applicable to the decision whether Rule 41(e) jurisdiction should be exercised in the court's discretion in the pre-indictment stage. *In re Sentinel Government Securities,* 530 F.Supp. 793 (S.D.N.Y.1982), and *In re Campola,* 543 F.Supp. 115 (N.D.N.Y.1982) (Miner J.), both held that Rule 41(e) jurisdiction should be exercised with care and restraint according to the customary restrictions applicable to lawsuits which request equitable relief. In *Campola,* for instance, the court held that a pre-indictment suppression motion should be considered only when the following factors are satisfied: "(1) whether there has been a clear showing of a search and seizure in callous disregard of the fourth amendment or some statutory provision; (2) whether the movants would suffer irreparable injury if relief is not granted; and (3) whether the movants are without an adequate remedy at law." *In re Campola,* 543 F.Supp. at 117. Although the Second Circuit has described a district court holding implementing these requirements, *Standard Drywall, Inc., v. Unit-*

ed States, 668 F.2d 156, 157 (2d Cir.), cert. denied, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982), the issue of *Calandra's* effect upon the Circuit's prior holding in *In re Fried, supra,* was not considered or resolved in *Standard Drywall.*

Another district court opinion diverges from the analysis in the above cited cases, and holds that Rule 41(e) requires consideration of a pre-indictment suppression motion without regard to the restrictions applicable to lawsuits requesting equitable relief. *Roberts v. United States,* 656 F.Supp. 929, 932–33 (S.D.N.Y.1987), *rev'd on other gr.* 852 F.2d 671 (2d Cir.1988), *cert. denied,* 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988). *Roberts* went further to hold that the exceptions to the exclusionary rule recognized by the Supreme Court would not apply to a pre-indictment suppression motion. *Id.* 656 F.Supp. at 933–37. On appeal to the Second Circuit, the holding with respect to application of the exclusionary rule exceptions was reversed, but there was no endorsement or criticism of the district court's preliminary holding that pre-indictment suppression motions should be entertained under Rule 41(e) without restriction. *Id.* 852 F.2d at 675.

This court has followed the former approach in two cases, requiring satisfaction by the movant of the three conditions set forth in *Campola,* quoted above. *Ryers Creek Corporation v. MacMartin,* unpublished Civ. 89–157T, at 4–5, 1989 WL 231304 (W.D.N.Y. April 20, 1989) (Telesca, C.J.), and *United States v. Joseph Padilla and Alfredo Rivera, et al, (claimants),* unreported Report and Recommendation, Misc. Civ. 91–200T, at 3–6, 9–10 (W.D.N.Y. November 14, 1991), which was adopted in an unpublished order, Misc. Civ. 91–200T (W.D.N.Y. February 5, 1992) (Telesca, C.J.). The *Padilla* matter involved property which was the subject of a separate civil forfeiture proceeding.[2]

Significantly, none of the modern cases within this circuit involve motions to sup-

press a confession. Guidance may be gleaned from decisions of the Supreme Court. Just as the Court has held that the fourth amendment exclusionary rule does not apply to grand jury proceedings, *United States v. Calandra,* 414 U.S. at 349–352, 94 S.Ct. at 620–22, the Court has also at least "suggest[ed]" that an indictment obtained through the use of evidence previously obtained in violation of the privilege against self-incrimination 'is nevertheless valid.'" *United States v. Williams,* —— U.S. ——, ——, 112 S.Ct. 1735, 1743, 118 L.Ed.2d 352 (1992) (quoting *United States v. Calandra,* 414 U.S. at 346, 94 S.Ct. at 619). Furthermore, the Supreme Court has held quite clearly that, "[a]lthough conduct by law enforcement officials prior to trial may ultimately impair that right [i.e. the fifth amendment self-incrimination privilege], a constitutional violation occurs only at trial." *United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222 (1990). *See United States v. Rivieccio,* 919 F.2d 812, 816 (2d Cir.1990) ("a violation of either the privilege against self-incrimination or 18 U.S.C. § 6002 requires only the suppression at trial of a defendant's compelled testimony"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). Compare *United States v. North,* 920 F.2d 940, 947–48 (D.C.Cir.1990) (drawing "the fundamental distinction between the presentation to the grand jury of evidence that has previously been unconstitutionally-obtained and that of constitutionally obtained evidence whose exposure to the grand jury amounts to a constitutional violation in and of itself," which was described as categories of evidence which "fall on different sides of this fence"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Accordingly, the same prudential considerations which have led some courts to limit the availability of Rule 41(e) relief in the pre-indictment stage under familiar principles of equitable relief serve to militate against freewheeling pre-indictment

---

2. Although the Second Circuit has not [formally] resolved this issue as yet, it directed district courts faced with a Rule 41(e) motion in a pre-indictment stage to caption the case, "Thompson v. United States of America," thus signaling continued adherence to its previously expressed view that "such proceedings [should be regarded] as independent actions ..." *Standard Drywall, Inc.*

*v. United States,* 668 F.2d at 157 n. 3 (citing *Grant v. United States,* 282 F.2d 165 (2d Cir. 1960)). That convention is followed here. [Subsequent to the preparation of this Report and Recommendation, *Padilla* was affirmed by the Second Circuit. *See* 986 F.2d 499 (2d Cir.1992). *See also, Mora v. United States,* 955 F.2d 156, 158 (2d Cir.1992).]

consideration of fifth and sixth amendment suppression issues involving statements of the accused. The Second Circuit's decision in *In re Fried, supra,* thus does not appear to provide an adequate basis to upon which to consider pre-indictment motions to suppress confessions in every case.

Although I would hold in accordance with the prior precedent within this district that motions to suppress should not be entertained in the court's discretion in the ordinary case unless the movant can show that he or she lacks an adequate remedy at law and that he or she will suffer irreparable injury, it is unnecessary to decide whether and to what extent such motions should be entertainable in the pre-indictment stage. The effect of the government's concession is that any prudential considerations which might preclude consideration of such motions in the pre-indictment stage, particularly those that relate to the potential interference and delay of the grand jury process and the speedy resolution of criminal cases, are not present here. The government acknowledges that it cannot proceed against the defendant if both statements to INS officials are suppressed, and it evidently wishes a determination of the legal issue before it takes up valuable grand jury time. Accordingly, I proceed to consider the merits of defendant's motion.[3]

C. *Suppression of the Statements to McLaughlin on Fifth Amendment Grounds Only*

 Contrary to defendant's abstract view of the events on November 18th, there was no evidence adduced at the hearing to suggest that McLaughlin's questions of defendant, whenever they might have occurred, were causally related to the discovery of defendant's wallet and birth certificate. McLaughlin was there with the RPD officers for the very purpose of questioning suspects concerning their birth place and citizenship. Nothing in the evidence suggests that he would have done so only when confronted with suspect birth certificates. Defendant obviously would have been questioned on his citizenship even if the documents had not been discovered. Furthermore, there is no evidence, or indication even, that defendant's answers to McLaughlin's questions would have been different, depending on whether defendant knew of the existence of the illegal search or was confronted with the documents. Indeed, defendant did not testify that McLaughlin's questions or his answers were in any way linked to the discovery of the wallet and birth certificate. The wallet and birth certificate were not shown to have been in any way connected with defendant's decision to answer the few questions McLaughlin asked him, or with the content of defendant's answers.

*New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), teaches in Fourth Amendment "taint" cases that a district court must determine whether the procurement of the confession "bear[s] a sufficiently close relationship to the underlying illegality" that a "cour[t] [may] determine that 'the challenged evidence is in some sense the product of illegal governmental

---

**3.** The court is aware of the "maxim that parties cannot confer jurisdiction on a federal court by consent or stipulation." *Reale International, Inc. v. Federal Republic of Nigeria,* 647 F.2d 330, 331 (2d Cir.1981). *See also, Insurance Corporation of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *Cable Television Association v. Finneran,* 954 F.2d 91, 94 (2d Cir.1992). But the court has jurisdiction by virtue of Fed. R.Crim.P. 41(e) and *In re Fried, supra,* which has not yet been overruled or modified in this circuit. *Compare White Fabricating Company v. United States,* 903 F.2d 404, 407–08 (6th Cir.1990), with *id.* 903 F.2d at 413–15 (DeMascio, J., dissenting). The only question is whether this jurisdiction should be exercised in the court's discretion.

*United States v. Padilla, supra,* at 5–6 (citing *Matter of Seizure of Four (4) DC–3 Aircraft,* 134 F.R.D. 251, 255 (F.D.Wisc.1991)). When all of the discretionary considerations relevant to a decision to deny relief are represented by the government not to exist—there will be no grand jury investigation until the court decides the motion, and the government has no independent interest in the items which it concedes were illegally seized without a warrant, *see White Fabricating Company v. United States,* 903 F.2d at 414–15 (DeMascio, J., dissenting)—little reason to decline exercise of jurisdiction is apparent. The parties' stipulation is therefore appropriately considered on the issue of the court's discretion, although it obviously is not dispositive.

activity.'" *Id.* 495 U.S. at 18, 110 S.Ct. at 1643 (quoting *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980)). There is no question of "attenuation" until the connection between the primary illegality and the evidence obtained is established. *Id.* 495 U.S. at 17–19, 110 S.Ct. at 1643–44 (adopting the reasoning of *People v. Harris,* 72 N.Y.2d 614, 625–26, 536 N.Y.S.2d 1, 532 N.E.2d 1229 (1988) (Titone, J., concurring)). The preliminary question in cases like this is whether "the evidence was not 'come at by exploitation of' . . . the illegal entry into . . . [defendant's] home." *Id.* 495 U.S. at 19, 110 S.Ct. at 1644 (quoting *United States v. Crews,* 445 U.S. at 471, 100 S.Ct. at 1250). As stated above, that factual showing has not been made in this case. *United States v. Lewis,* 760 F.Supp. 997, 1003 (E.D.N.Y.1990) ("[a] search is not usually undertaken to obtain evidence that would be used to induce a defendant to confess to a crime").

Without a connection shown between the documents discovered and defendant's answers to McLaughlin, indeed without a showing that McLaughlin exploited the documents to procure defendant's statements, the issue devolves to whether the illegal search itself prompted defendant's statements or whether the statements may be said to have been the product of the failure of the government to obtain a warrant prior to their entry into defendant's apartment. *Cf. United States v. Beltran,* 917 F.2d 641, 645 (1st Cir.1990) (important factors in the *Harris* analysis are "when the police seized the items in question or what motivated [the] statements"). The answer to that question depends upon which version of the facts presented at the hearing the court accepts and finds is true. Ironically, the version of the facts proffered by the government, through McLaughlin's testimony that defendant spoke with him while McLaughlin and the other officers were illegally there searching the apartment, leads inescapably to a finding of taint. And the version of the facts proffered by the defendant, through his testimony that McLaughlin did not question him until his detention at the stationhouse downtown, leads just as firmly to the conclusion that there was no taint.

Beginning with the defendant's version first, the suppression issue was squarely decided in *New York v. Harris, supra,* by illustration. In the course of explaining why the *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) violation did not taint the stationhouse confession of Harris, the court observed:

> For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his door step, illegally entered his home to search for evidence, and later interrogated Harris at the station house.

*Id.* 495 U.S. at 18, 110 S.Ct. at 1643. Similarly, in this case, Thompson was arrested on his doorstep, the police illegally entered his apartment to search for evidence, and, according to Thompson, he was questioned at the stationhouse. As in *Harris,* Thompson was legally detained, having just sold cocaine to an undercover officer. There is less a connection between the officers' illegal entry to search in this case than in *Harris,* where the officers' illegal entry was for the purpose of effectuating an arrest and detention. Thompson's arrest and detention had been effected by the time of the search, and his statements to McLaughlin were at least as divorced from the illegal search of the apartment as were Harris' statements divorced from the illegal entry precipitating Harris' arrest and detention. By defendant's own testimony, which did not seek to link the answers to McLaughlin at the stationhouse to the discovered birth certificate, "the [g]overnment did not use an advantage gained by its illegal activity to obtain . . . [defendant]'s statements." *United States v. Duchi,* 944 F.2d 391, 395 (8th Cir.1991). Therefore, under defendant's version of the facts, and in the absence of any showing that the evidence seized was connected to defendant's statements to McLaughlin, the *Harris* Court's illustration quoted above is on all fours, and it must be concluded that there is no Fourth Amendment taint reaching those statements made on November 18th.

Under the government's version, because defendant's statements were made to McLaughlin in his apartment during

McLaughlin's illegal presence there, they would be suppressible as a fruit of the illegal entry. Whether it was McLaughlin's illegal presence in the apartment which provided the impetus for, or was necessary to, his questioning of defendant, and which caused defendant's answers, or whether instead it might be held that McLaughlin would have questioned him anywhere, are questions requiring some degree of metaphysical reasoning to arrive at an adequate answer. It is enough that the trial court in *Harris* suppressed the first confession made during the period of illegal entry and that this ruling has been commonly accepted as correct. *New York v. Harris*, 495 U.S. at 15, 110 S.Ct. at 1642. *See also*, under pre-*Harris* analysis, *United States v. Patino*, 830 F.2d 1413, 1418 (7th Cir.1987) (first confession proximate to unconstitutional search suppressed), *after remand*, 862 F.2d 128, 131–33 (7th Cir.1988) (second confession six days after illegal search not connected to the search), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 637 (1989). I assume, then, for purposes here, that suppression should result on Fourth Amendment grounds if the government's version of the facts is accepted.

But McLaughlin's testimony that defendant was taken back to his apartment after being secured outside the building does not make sense. Mann's testimony that he secured defendant in a squad car immediately after a scuffle describes good police practice and naturally would be expected. No good reason existed to remove defendant from the car and return him to his apartment, and such a course of action would have, in view of defendant's initial resistance to arrest, been properly regarded as dangerous. McLaughlin did not attend defendant after his arrest. Mann did, and his testimony is quite satisfactory on this point.

Finding that defendant was not returned to the apartment does not mean that the court must accept in full defendant's version. The custody log does not reveal a McLaughlin visit with defendant at the stationhouse. If McLaughlin met with defendant alone there, his personal "custody" of the defendant would have been entered on the log. It is probable, therefore, that he spoke with defendant some time between his arrest and subsequent detention at the stationhouse—perhaps in the squad car while the search was on-going. It really does not make any difference because, if the conversation occurred anywhere outside the apartment, *Harris* compels denial of the motion to suppress insofar as it is based on Fourth Amendment grounds. If "the exclusionary rule does not bar the State's use of a statement made by the defendant *outside of his home*, even though the statement is taken after an arrest made in the home in violation of *Payton*," *New York v. Harris*, 495 U.S. at 21, 110 S.Ct. at 1644–45 (emphasis supplied), the exclusionary rule similarly does not bar the government from using statements made outside defendant's apartment even though the statement is made while an illegal warrantless entry for purposes of a search is underway. The *Payton* violation in *Harris* is functionally similar to the warrantless entry to search in this case. As in *United States v. Lewis, supra*, "[m]uch of the reasoning in *New York v. Harris*, ..., is applicable here." *Id.* 760 F.Supp. at 1003 n. 12.

For the same reason I find that McLaughlin would have questioned defendant regarding his citizenship regardless of when Rochester Police officers discovered the suspect Virgin Islands birth certificate, I reject the government's contention that McLaughlin did not interrogate defendant within the meaning of *Miranda*. The government concedes the custody element of *Miranda*, but the government contends that McLaughlin could not have interrogated defendant within the meaning of *Miranda* unless he "had a suspicion that the defendant has committed a crime within his jurisdiction." Government's Response, at 6. The government reasons, as defendant does when the latter is presenting the Fourth Amendment claim, that no such suspicion could arise until discovery of the suspect certificate. McLaughlin was not there simply for the ride.

Interrogation within the meaning of *Miranda* is defined as "express questioning or its functional equivalent," that is, "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reason-

ably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The government's argument that McLaughlin's role that night as part of the Jamaican interdiction team was merely administrative in nature and otherwise "innocent of any investigative purpose," *United States·v. Gotchis*, 803 F.2d 74, 79 (2d Cir.1986), is not supported by the evidence adduced at the hearing. McLaughlin conceded on cross-examination that the team he joined on the evening of February 18, 1989, was searching for Jamaican citizens illegally present in the United States. McLaughlin also conceded that he knew the answers to questions he asked might have criminal consequences, depending upon their content, and he conceded further that he had an obligation to refer all relevant matters he discovered to the United States Attorney for prosecution. As indicated above, McLaughlin was not along for the ride that night. His duty station was Buffalo, yet he travelled here in the obvious anticipation that the drug investigations he assisted would turn up evidence of illegal aliens. *See* McLaughlin Affidavit Supporting the Criminal Complaint, at ¶ 2.

It is true that a majority of the Supreme Court recognizes a "routine booking question exception" to *Miranda*, although its precise contours have not been sharply defined. *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990) (plurality opinion); *id.* 496 U.S. at 606, 110 S.Ct. at 2653 (Rehnquist, C.J., concurring in part and dissenting in part). The Second Circuit has also addressed the booking exception applicable to pedigree information:

> [T]he solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), whether the solicitation occurs before, *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112–13 (2d Cir.1975), *cert. denied*, 423 U.S. 1090 [96 S.Ct. 884, 47 L.Ed.2d 101] (1976), or after, *United States v. Gotchis*, 803 F.2d 74, 78–79 (2d Cir.1986), *Miranda* warnings are given.

*United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir.1988), *after remand*, 877 F.2d 174, 179 (2d Cir.1989), *cert. denied*, 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). *See also, United States v. Carmona*, 873 F.2d 569, 573 (2d Cir.1989); *Jacquin v. Stenzil*, 886 F.2d 506, 508 (2d Cir.1989), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3236, 111 L.Ed.2d 747 (1990).

The questions McLaughlin asked of defendant, however, whether at the scene or at the stationhouse, obviously were not necessary or attendant to the booking of defendant that evening by the Rochester Police or the Monroe County Jail. Moreover, the booking exception is not absolute. " 'Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' " *Pennsylvania v. Muniz*, 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14 (plurality opn.) (quoting Brief for United States as *Amicus Curiae*, at 13). *See also, United States v. Montana*, 958 F.2d 516, 518 (2d Cir.1992) ("solicitation of pedigree information *normally* does not amount to custodial interrogation") (emphasis supplied). One of the cases cited by the *Muniz* plurality in support of this proposition is the principal case upon which defendant relies. *United States v. Mata–Abundiz*, 717 F.2d 1277 (9th Cir.1983). In that case, like this one, the defendant was arrested on state charges and confined in a local jail. Ten days after his arrest, an INS investigator visited the defendant to obtain biographical information and to determine immigration status. The government argued that the questions fell within the routine booking exception and were posed to the defendant pursuant to a "civil investigation." *Id.* 717 F.2d at 1278. Both contentions were rejected. The Ninth Circuit held that the INS investigator "had reason to know that any admission of alienage by Mata would be highly incriminating." *Id.* 717 F.2d at 1279. It was important that the questions asked "related directly to an element of a crime that ... [the investigator] had reason to suspect." *Id.* 717 F.2d at 1280.

The same considerations apply to McLaughlin's questions. In addition, he was not hired by the Rochester Police to perform any part of the booking procedure. *Id.* 717

F.2d at 1280 (important that questions not asked by the particular government agency responsible for booking and taking suspect into custody); *United States v. Hinckley*, 672 F.2d 115, 112–23 (D.C.Cir.1982) (same). The booking or pedigree exception "is inapplicable, . . ., where the elicitation of information regarding immigration status is reasonably likely to inculpate the subject." *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1046 (9th Cir.1990). If "questions about citizenship, asked on the high seas, of a person present on a *foreign* vessel with drugs aboard, would (in our view) seem 'reasonably likely to elicit an incriminating response,'" *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir.1989) (emphasis in original) (quoting *United States v. Mata–Abundiz*, 717 F.2d at 1280), then the questions McLaughlin asked, during an undercover drug operation targeting illegal alien Jamaican nationals, and which were posed very shortly after the suspects were arrested and secured, similarly constituted interrogation within the meaning of *Miranda*.

Nor does McLaughlin's questioning appear at all similar to routine customs or border patrol questioning at a point of entry, which also have been held exempt from *Miranda's* requirements. *United States v. Silva*, 715 F.2d 43, 46–48 (2d Cir.1983). McLaughlin was not shown to have engaged in routine border questioning, and his testimony quite clearly shows that the Jamaican interdiction team he worked with was engaged in an enterprise of an entirely different sort. Accordingly, it is my Report and Recommendation that defendant's statements to McLaughlin be suppressed on Fifth Amendment grounds only.

## D. *Challenges to the Second Statement*

 Nearly a month after the defendant's arrest and statements to McLaughlin, he was interviewed at the jail by Special Agent Hoelter. The statements made to Hoelter were the same as those made to McLaughlin, i.e., that defendant claimed United States citizenship by virtue of a Virgin Islands birth. This time, however, Hoelter fully advised defendant of his *Miranda* rights and defendant executed a written waiver. Defendant contends (1) that the second statement must be suppressed under a "cat-out-of-the-bag" theory because his identical statements made a month before to McLaughlin were unwarned, (2) that the filing by attorney Gallina of the INS Form G–28 triggered a Fifth Amendment "*Miranda*-right-to-counsel" which precluded the government from questioning defendant in the absence of counsel, and (3) the questioning of defendant without counsel's presence violated DR 7–104(A)(1) of the New York Code of Professional Responsibility, as implemented in *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988).[4]

First, the exclusionary rule does not reach to exclude a subsequent properly warned voluntary confession as "the alleged 'fruit' of a noncoercive *Miranda* violation." *Oregon v. Elstad*, 470 U.S. 298, 304–09, 105 S.Ct. 1285, 1290–93, 84 L.Ed.2d 222 (1985). *See United States v. Valencia*, 826 F.2d 169, 177 (2d Cir.1987) ("The exclusion of a statement on the basis of a *Miranda* violation, . . ., does not render all subsequent statements on the subject matter excludable."); *United States v. Morales*, 788 F.2d 883, 886 (2d Cir.1986) ("nor has suppression of a first, unwarned

---

4. Defense counsel also claims that the statements to Hoelter were "indisputably a 'fruit' of the illegal search of Apartment # 6," but he provides no factual support for this contention. Feldman Affidavit at ¶ 23. Defense counsel reasons that, but for McLaughlin's direction to Hoelter to conduct the interview, which would not have been given absent McLaughlin's tainted knowledge of the suspect birth certificate, Hoelter would not have had reason to interview defendant. The chain of causation suggested by defense counsel thus presupposes that McLaughlin's interest in defendant's citizenship had its source solely in the illegal discovery of the birth certificate. For reasons explained elsewhere in this opinion, I

have rejected this primary claim, and found that McLaughlin intended to question defendant regarding his citizenship in any event. For similar reasons, I find that there is no indication in the record that McLaughlin would have had any less reason to doubt the authenticity of defendant's claim to U.S. citizenship if the birth certificate had never been found. An investigation would have ensued anyway with, of course, the same results. Defendant has not moved to suppress the results of the investigation in the Virgin Islands on fruit-of-the-poisonous-tree grounds. *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

confession barred admission of a second confession of guilt"). Because defendant makes no colorable showing that either statement was coerced or otherwise involuntary, as opposed to simply unwarned, the *Elstad* rule is applicable here. *See also, Wilson v. O'Leary,* 895 F.2d 378, 381 (7th Cir.1990). Therefore, the unwarned nature of the first statement, and the fact that it must be suppressed on that ground, does not provide a ground for suppression of the properly warned second statement obtained nearly a month later by a different interrogator.

■ Defendant's contention that the filing of the INS Form G–28 invoked defendant's "*Miranda* right to counsel" is without merit. In two recent cases, the Supreme Court has reaffirmed the "*Miranda* right to counsel." *McNeal v. Wisconsin,* —— U.S. ——, ——, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991); *Minnick v. Mississippi,* 498 U.S. 146, 149–53, 111 S.Ct. 486, 489–91, 112 L.Ed.2d 489 (1990). In the most recent of these cases, the Court described the right as follows:

> In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), we established a second layer of prophylaxis for the *Miranda* right to counsel: once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," 451 U.S., at 484–485, 101 S.Ct. at 1884–1885—which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi,* 498 U.S. [146], 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, [1180], 108 L.Ed.2d 293 (1990). The *Edwards* rule, moreover, is *not* offense-specif-

ic: once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

*McNeal v. Wisconsin,* —— U.S. at ——, 111 S.Ct. at 2208 (emphasis in original). *See also Minnick v. Mississippi,* 498 U.S. at 153, 111 S.Ct. at 491 ("Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney").

Nothing in the Form G–28 suggests that defendant, by executing the document, requested counsel for his interrogation by Hoelter on March 15th or otherwise "desire[d] to deal with the police only through counsel." *Edwards v. Arizona,* 451 U.S. at 484–85, 101 S.Ct. at 1885 (quoted in *Minnick v. Mississippi,* 498 U.S. at 149, 111 S.Ct. at 489). The form is used primarily by attorneys to obtain access to their client's records in the possession of the Immigration & Naturalization Service, and is unrelated to the question of counsel's presence during custodial interrogations of accused or suspected criminals. Indeed the only opportunity the client has for expression on the form is by signing the consent required by the Privacy Act of 1974. The notice-of-appearance-as-attorney portion of the form concerns a declaration of the lawyer only and contains no specific directions to law enforcement officials or personnel by the defendant or his attorney. In short, nothing in the form or its filing with the INS should have alerted the government that defendant wished the services of counsel in connection with any future interrogation of him by INS agents. The *Edwards* rule is simply not invoked.

■ Even less troublesome is defendant's argument that Special Agent Hoelter's interview of defendant occurred in violation of DR 7–104(A)(1) and *United States v. Hammad, supra.* The *Hammad* rule, and particularly the Lawyer's Code of Professional Responsibility *Hammad* enforces, is directed to attor-

neys, not investigators. There is no evidence in this case that Hoelter had any contact with an Assistant United States Attorney or other INS attorney prior to his meeting with the defendant on March 15, 1989. *Cf. United States v. Buda*, 718 F.Supp. 1094, 1096 (W.D.N.Y.1989) (denying suppression even though an Assistant United States Attorney acquiesced in the wiring of an informant because he "in no way attempted to direct the content of his conversation with the defendant so as to beguile him into giving his case away"). Accordingly, DR 7–104(A)(1) is not invoked and suppression should not result under the *Hammad* decision.

### CONCLUSION

It is my Report and Recommendation, first, that the court exercise its discretionary jurisdiction to decide the matter; second, that it suppress and return all of its items seized from defendant's apartment # 6 at 132 S. Union Street; third, that it suppress defendant's statements to INS Special Agent McLaughlin on February 18, 1989, on Fifth Amendment *Miranda* grounds only; and fourth, that it deny defendant's motion to suppress defendant's statements to INS Special Agent Hoelter on March 15, 1989. It is also my Report and Recommendation that, in accordance with the prescriptions of *Standard Drywall* (discussed in fn. 2, *supra*), the Clerk open a Miscellaneous Civil file under the caption hereof, and transfer defendant's (plaintiff in the new action) motion papers, the government's response together with the referral order and this Report and Recommendation to the new file.

The parties should be on notice that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 30(a)(3), any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt thereof. Failure to file objections within the specified time waives the right to appeal a District Court Order adopting this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a) and 6(e); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 825, 121

L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Dated: Rochester, New York

November 17, 1992.